(C.D. 4766)

J. E. Bernard Co. *v.* United States

Court No. 76–3–00651

Port of Chicago

(Decided September 12, 1978)

*Barnes, Richardson & Colburn* (*Steven P. Sonnenberg* and *Thomas D. Terpstra* of counsel) for the plaintiff.
*Barbara Allen Babcock,* Assistant Attorney General (*Joseph I. Liebman,* trial attorney), for the defendant.

Landis, Judge: This written decision of the court is the outgrowth of a trial held before me in Chicago, Ill., in August 1977. The parties thereafter successively filed briefs in May and July 1978 and a reply brief was filed by plaintiff in August 1978.

The goods in question were imported from West Germany into the Port of Chicago in November 1974 and May 1975 and were invoiced as "Tuning pins M 6 G," "Tuning pins M 6," and "Tuning pins No. 14–586/14–587."

The merchandise was classified by Customs under TSUS item 726.55, as modified,[1] as "Parts of stringed musical instruments provided for in item 725.06 (except strings and tuning pins)."

Plaintiff claims the proper classification is under TSUS item 726.45 [2] as "Tuning pins."

As stated by plaintiff in its brief, page 3:

> * * * An examination of this product [tuning pins No. 14–586/14–587] reveals that it consists of a metal pin with an opening at one end. The opposite end is fitted into a worm gear which may be actuated by a handle or button which is perpendicular to the pin. When the button is turned the worm gear acts on the pin so as to rotate it. The rotation ratio is 12 turns of the button to one turn of the pin.

The other two items are identical to each other except that the M6G is yellow-gold covered while the M6 is chrome. Although they differ in appearance from the 14–586/14–587 model, they operate under a comparable principle.

The merchandise is used as parts of guitars, to tighten or loosen the guitar strings so that the instruments have the proper pitch.

At the outset, as has been urged by plaintiff, and as has been virtually conceded by defendant, it is clear that the claimed section of TSUS, item 726.45 relied on by plaintiff, is an *eo nomine* provision.

However, on the other hand, in considering the evidence introduced in this case, we are also aware of the presumption of correctness which favors the customs classification. *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 CCPA 88, C.A.D. 735 (1960); *United States* v. *New York Merchandise Co., Inc.*, 58 CCPA 53, C.A.D. 1004, 435 F. 2d 1315 (1970).

The evidence consists of the testimony of three witnesses for the plaintiff and one for the defendant and a number of exhibits.

Stanley Snyder, a purchasing agent for Gibson Inc., the actual importer in this case, was the first to testify. He identified samples of the imported articles. For example, on direct examination, he identified plaintiff's collective exhibit 1 as "a complete set of bass machine heads or tuning pins." (R. 7.) Snyder read the invoices as stating: "One is for 500 sets of tuning pins, M–6G; the other one is for 400 sets of tuning pins, chrome-plated." (R. 12.) He identified another exhibit as "M–6 tuning pins." (R. 16.) During voir dire though, significant damage was done to plaintiff's case by the statement appearing on the cover of the box in which some of the merchandise was imported, as appears in the following testimony (R. 20–21):

> MR. TERPSTRA [plaintiff's counsel]. I would like to move plaintiff's exhibit 4 into evidence.

---

[1] Modified by T.D. 68-9 and dutiable at the rate of 17 per centum ad valorem.

[2] Modified by T.D. 68-9 and dutiable at the rate of 17 cents per 1,000 pins, plus 6 per centum ad valorem.

JUDGE LANDIS. Any objection?

MR. LIEBMAN [defendant's counsel]. May I examine on voir dire, Your Honor?

JUDGE LANDIS. Yes.

MR. LIEBMAN Mr. Snyder, plaintiff's exhibit 4 for identification you described as a collective set of six of the M–6G machine heads; is that correct?

THE WITNESS. Yes.

MR. LIEBMAN. Are they contained in a box?

THE WITNESS. Yes.

MR. LIEBMAN. Is this the box that they are received in when you receive the shipment?

THE WITNESS. Yes.

MR. LIEBMAN. Is the box the same type of box enclosing the merchandise involved in the entries which are the subject of this court case?

THE WITNESS. Yes.

MR. LIEBMAN. Does the box contain on its cover any descriptions of the contents?

If you would like to, you may examine it.

[Handing to the witness.]

THE WITNESS. It says—Yes, it does. It says, "The world's finest guitar and bass machine heads."

MR. LIEBMAN. To your knowledge, does it say, anywhere on that box, "tuning pins"?

THE WITNESS. No.

Plaintiff's second witness, Julius Bellson, was a "musicologist" at Gibson approximately 40 years and in addition to composing music had served with Gibson as production manager, industrial manager, and treasurer. This witness of plaintiff stated he would not confine the definition of "tuning pin," as set forth in "Webster's New International Dictionary" (plaintiff's exhibit 6):

> *tuning pin or peg. Music.* A pin to which the strings are fastened, as in pianos and in instruments of the violin family.

to instruments such as pianos and violins, since other instruments such as guitars, mandolins and banjos have pegs. Bellson's testimony was further in substance that all of plaintiff's tuning devices were "tuners"; that a difference existed between "tuning pins" and "tuners" and he did not refer to the exhibits representing the imported merchandise in this case as "tuning pins" but as "tuners."

The third witness for plaintiff, Walter Fuller, also was a retired 40-year veteran at Gibson. He testified that he would refer to the exhibited items as tuning keys, tuning pegs, tuning pins, or machine heads depending on with whom he was speaking. Whichever appellation was used by the other party, he would use. Fuller did add that if he were preparing a parts list, he would refer to the articles as "machine heads." (R. 99).

The sole witness for defendant was Joseph Richard Merkel, president of Kluson Manufacturing Co. which manufactures and sells metal and plastic parts for stringed musical instruments. The following exchange occurred during direct examination of Mr. Merkel (R. 114):

Q. Have you, or to your knowledge, has the Kluson Manufacturing Company ever sold a tuning pin?—A. We have never sold a tuning pin. No. That is correct.

Q. But you have sold machine heads; is that correct?—A. Correct, we have sold machine heads.

Q. Do you understand "machine heads" to be a different article of commerce from a "tuning pin"?—A. Yes, I do.

Based upon this evidence and having observed the witnesses and their demeanor on the witness stand, it is my opinion that the presumption of correctness attaching to the Customs' classification of this imported merchandise has not been rebutted, that plaintiff has not sustained the burden of proving the classification by Customs was erroneous and plaintiff's claimed classification was correct. Accordingly, defendant must herein prevail.[3]

It is also noted that in defendant's brief it is argued that pertinent sources of legislative history demonstrate that successive Congresses have intended the tariff provision for "tuning pins" to be limited to specially designed pins of the type for tuning pianos and harps.

Plaintiff argues in its reply brief that the legislative history is not relevant as the common meaning of the term "tuning pin" is clear and unambiguous. This argument by plaintiff is difficult to understand for, as has heretofore been pointed out, plaintiff's evidence on the meaning of the term "tuning pin" was ambiguous and in particular plaintiff's witness Bellson stated he did not agree with the dictionary definition plaintiff introduced into evidence (plaintiff's exhibit 6). It should also be noted that no claim has been made nor any contention advanced that the commercial meaning is different from the common meaning, which in the absence thereof are presumed to be the same. *August Bentkamp* v. *United States*, 40 CCPA 70, C.A.D. 500 (1952); *United States* v. *C. J. Tower & Sons of Buffalo, N.Y.*, 48 CCPA 87, C.A.D. 770 (1961).

A leading case on the significance and relevance of legislative history is *United States* v. *Amer. Trucking Ass'ns.*, 310 U.S. 534 (1940), wherein the Supreme Court of the United States stated (pp. 542–544):

In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress. There is no invariable rule for the discovery of that intention. To take a few words from their context

---

[3] As plaintiff has made no showing that the imported merchandise is classifiable as "tuning pins" under TSUS item 726.45, there is no reason to consider its citation of General Interpretative Rule 10(ij).

and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute * * *.

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." * * *

See also, *United States* v. *Kung Chen Fur Corporation,* 38 CCPA 107, C.A.D. 447.

I now will examine the legislative history surrounding "tuning pins."

The first mention of "tuning pins" in the tariff laws appeared in the Tariff Act of 1922:

PAR. 1443. Musical instruments and parts thereof, not specially provided for, pianoforte or player actions and parts thereof, cases for musical instruments, pitch pipes, tuning forks, tuning hammers, and metronomes, strings for musical instruments composed wholly or in part of steel or other metal, all the foregoing, 40 per centum ad valorem; *tuning pins, $1 per thousand and 35 per centum ad valorem;* violins, violas, violoncellos, and double basses, of all sizes, wholly or partly manufactured or assembled, $1 each and 35 per centum ad valorem; unassembled parts of the foregoing, 40 per centum ad valorem. Ch. 356, 42 Stat. 858, 919–920 (1922). [Emphasis supplied.]

Legislative history demonstrates that the tuning pin provision was incorporated in paragraph 1443 at the behest of the piano industry and for its benefit. Testifying before the Ways and Means Committee of the House, one Alfred L. Smith, representing the Music Industries Chamber of Commerce of New York (an umbrella organization of eleven musical national trade associations), reviewed the tariff history of piano parts. He stated [hearings on general tariff revision before the House Committee on Ways and Means, pt. 5, Schedule N, 66th Cong., 3d Sess. (1921), p. 3435]:

* * * I wish to call the attention of the committee to the fact that prior to the war our chief imports under this schedule were certain piano parts, felts, actions, wire, and tuning pins, and also band instruments, and small instruments like violins and similar small goods. * * *

When the First World War impeded the importation of piano parts; he said "our industry was very seriously embarrassed." He explained further:

> The tuning pin, for instance, is a typical example which I will cite to the committee. The tuning pin is a vital article in piano manufacture and an exceedingly difficult thing to manufacture, although it looks very simple to the average person. Before the war there was only one plant of any importance in this country making tuning pins. There are now four well-established plants and several minor ones trying to make those. Before the war; four-fifths of the tuning pins were imported from Germany, and now the importations probably do not amount to but one-fifth. And the piano manufacturers wish to have this industry developed in this country so that they can absolutely depend upon it, so that there will be enough facilities to supply the piano manufacturers. [*Id.*, p. 3436.]

The written brief of the Music Industries Chamber of Commerce of New York stated that:

> The American tuning-pin manufacturers are still going to much time and expense in experimental work to improve quality, so that with adequate tariff protection it is reasonable to expect that the tuning pins will ultimately be sufficiently superior to the foreign article so as to be able to compete entirely on a quality instead of price basis.* * * [*Id.*, p. 3438.]

Thus the "tuning pin" provision always connoted piano pins.

Paragraph 1541(a) of the Tariff Act of 1930, Ch. 497, 46 Stat. 590, 668–669 continued the tariff provision for tuning pins:

> PAR. 1541. (a) Musical instruments and parts thereof, not specially provided for, pianoforte or player-piano actions and parts thereof, violin bow hair, pitch pipes, tuning forks, tuning hammers, and metronomes, all the foregoing, 40 per centum ad valorem; pipe organs or pipe-organ player actions and parts thereof, 60 per centum ad valorem: *Provided,* That for pipe organs or pipe-organ player actions and parts thereof especially designed and constructed for installation and use in a particular church; or in a particular public auditorium at which it is not customary to charge an admission fee, which are imported for that specific use, and which are so installed and used within one year from the date of importation, the rate of duty shall be 40 per centum ad valorem; and the Secretary of the Treasury is authorized to make all needful rules and regulations for carrying out the provisions of this clause; cases for musical instruments, 50 per centum ad valorem; chin rests for violins, 40 per centum ad valorem; bridges for fretted stringed instruments, not specially provided for, 50 per centum ad valorem; strings for musical instruments, composed wholly or in part of catgut, other gut, oriental gut, or metal, 40 per centum ad valorem; *tuning pins, $1 per thousand and 35 per centum ad valorem.* [Emphasis supplied.]

In 1948, the "Summaries of Tariff Information" contained the following "Comment" on tuning pins:

> Tuning pins are pegs for pianos and harps by which tension of the strings can be altered for changes in pitch. Steel tuning pins for pianos are slightly over 2 inches long and about one-fourth inch in diameter. The end driven into the piano plate is cylindrical; the projecting end is square to fit the tuning wrench, which is known in the trade as a hammer. Smaller but similar pins are used in harps. [1948 "Summaries of Tariff Information," vol. 15, pt. 8, p. 54.]

As the defendant notes in its brief: "Significantly, 'tuning pins' are specifically excluded from the description in the summaries of pianos and parts thereof, but no exclusionary reference appears in the description contained in the summaries of stringed fretted musical instruments, which include string guitars." The defendant's subsequent deduction appears justified: "This indicates that 'tuning pins,' and 'machine heads,' are different articles for tariff purposes."

The "Summaries of Trade and Tariff Information" provides further support for this distinction. "Summaries of Trade and Tariff Information," schedule 7, volume 3, page 108 (1968) states: "The principal parts of fretted stringed instruments are machine heads, shell picks or plectrums, and bridges." Tuning pins are described later as: "small pegs made from steel wire, which are driven into the frame of pianos and harps and used for attaching the strings. The pins are turned by means of a tuning wrench or 'hammer' to change the tension of the strings for the purpose of adjusting pitch." *Id.*, 168.

Thus, the weight of the evidence, as well as the legislative history, compels the sustaining of the Customs Service's classification of the merchandise under TSUS item 726.55.

The action is dismissed. Judgment will be entered accordingly.